**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| LEWIS RAYMOND FONSECA-CORTES | Civil No.:  26-1163 |
| Plaintiff, | |
| v. | **TORT ACTION FOR NEGLIGENCE; MEDICAL MALPRACTICE.** |
| UNITED STATES OF AMERICA, as operator of the VETERANS AFFAIRS HOSPITAL OF SAN JUAN, PUERTO RICO, | **FEDERAL TORT CLAIMS ACT**. |
| Defendants. | |

## <u>COMPLAINT</u>

**TO THE HONORABLE COURT:**

**APPEAR NOW** the Plaintiff in this action, through the undersigned attorneys, and respectfully state, allege and request as follows:

### <u>JURISDICTIONAL BASIS AND VENUE</u>

1. Defendant, the United States of America, operates the Veterans' Affairs Hospital of San Juan, Puerto Rico.

2. Federal question jurisdiction exists under 28 U.S.C. §1346 (b).

3. On May 2, 2024, a timely administrative claim was presented to the Department of Veterans' Affairs on behalf of Plaintiff.  *See* Exhibit 1.

4. The parties entered into the administrative claim process, which terminated upon the Department of Veterans' Affairs' notice of denial of the claim, dated February 23, 2026. *See* Exhibit 2.

5. As such, this allows Plaintiff to file suit to have this Court address his claims.

1

6. Venue lies in this District, pursuant to 28 U.S.C. §1402 (b) since this is the District in which the acts or omissions giving rise to this Complaint took place.

## PARTIES

7. Plaintiff, Lewis R Fonseca-Cortes, a 35-year-old man, is a citizen of the United States, and a legal resident of Puerto Rico, (referred to hereinafter as Lewis, patient or Mr. Fonseca)

8. Defendant is the United States of America, as operator of the Veterans' Affairs Hospital of San Juan (herein after "VA"), which provides medical services to Veterans in Puerto Rico.

## GENERAL ALLEGATIONS

9. As early as 2017, Lewis began complaining about his back pain.

10. In early 2018, Lewis starts complaining insistently to his VA doctors of his progressively worsening lower back pain.

11. An x-ray of the lumbosacral spine was taken on February 26, 2018. The x-ray revealed mild degenerative changes in the L5/S1 disc space.

12. Lewis returned to the VA on May 2, 2018, for a follow up appointment unrelated to his back pain.

13. During this visit he again reported his persistent back pain, which was now radiating to his left side and was described as electrical shots through the posterior thigh that increased with long periods of standing or sitting.

14. On the same May 2, 2018, visit, Lewis was referred to a physical medicine and rehab consultation, to consider the need for electrodiagnostic (EDX) studies and nerve conduction studies (NCS).

15. A EDX exam was not performed.

2

16. It was also noted that the "mild degenerative disc disease at L5/S1 [was] not impressive, [and] unlikely to cause significant foraminal stenosis and thus radiculopathy."

17. In other words, the VA observed as early as May 2, 2018, that the identified degenerative disc disease in his spine was unlikely to be the source of Lewis's pain.

18. Lewis was recommended physiotherapy.

19. An x-ray was performed this same day of Lewis's spine, sacrum and coccyx.

20. The images revealed a sub centimeter area of stenosis at the left femoral head, which the VA indicated "probably represent[ed] a bone island," as well as a "small[,] radiolucency observed at the left femoral neck partially included in the field of view."

21. Bone islands typically do not present with pain.

22. The presence of a bone island accompanied with pain warrants further investigation to rule out more serious conditions, such as cancer.

23. Dedicated views of the left hip were recommended, yet no such imaging was taken that day.

24. Lewis continued suffering from much back pain which also adversely affected his emotional state.

25. Lewis returns to the VA seeking mental health treatment for major depressive disorder and anxiety on May 22, 2018.

26. On June 13, 2018, Lewis again returns to the VA for (MRI) magnetic resonance imaging imaging of his lumbar spine due to his persistent and radiating back pain.

27. The MRI reveals "focal advanced degenerative disc changes at L5-S1 but no significant focal disc herniations nor nerve root impingements at this time."

28. Again, no images of his left hip were taken.

3

29. Almost two weeks later, June 26, 2018, Lewis seeks further mental health treatment for his depression and anxiety. Lewis specifically notes difficulty staying asleep due to his continued pain.

30. On June 29, 2018, Lewis attended a follow up evaluation for his lower back pain.

31. Mr. Fonseca was prescribed meloxicam, a NSAID for pain management. Finally, x-rays of his hips bilateral with pelvis are taken.

32.  The June 29, 2018, x-rays revealed an abnormal growth on the left femoral head.

33. This growth was misdiagnosed as "a small benign bone island . . . [with] a small focal area of decreased density in the left femoral neck felt to represent a benign fibrous cortical defect—" a defect **found primarily in children** and is rarely found in skeletally mature adult patients.

34. Mr. Fonseca's ongoing and worsening pain and symptoms were misdiagnosed, mistreated and ignored.

35. A physical therapy consultation request was placed by Mr. Fonseca on June 30, 2018, to address the exacerbation of his chronic lower back pain.

36. Mr. Fonseca continued suffering from back pain which greatly interfered with his daily life, ability to sleep and worsened his emotional state.

37. On July 17, 2018, Lewis sought further mental health treatment though the Panamericano-Hato Rey's partial hospitalization program and was subsequently discharged on July 19, 2018.

38. Lewis begins physical therapy on July 26, 2018, but this did not improve his low back pain.

39. Lewis returns to the VA on August 16, 2018, for a primary care follow up visit, yet no plan is provided to address his ongoing back pain.

4

40. He again returns to the VA for a physical medicine rehab consultation to address his ongoing lower back pain on October 15, 2018.

41. During this visit his pain was described as sharp, burning sensations in the lumbar region with irradiation to the buttocks and occasionally to the posterior aspects.

42. This pain would increase with sleeping, prolonged sitting/standing, bending forward, or rising from a chair and was usually around 6-8/10 on the pain scale.

43. A left SI joint block was prescribed, which was not administered until November 5, 2018.

44. On October 31, 2018, a (CT) computed tomography scan to examine Lewis's kidneys was taken of his abdomen and pelvis without contrast. The record notes that the absence of IV contrast reduces the sensitivity of the CT exam, however, it was still done without contrast.

45. No observations, findings, or impressions were made regarding the mass on his left femur and/or the state of his hip/pelvic bones.

46. On November 2, 2018, Lewis notes his pain is considerable and categorized as a 7/10.

47.  Lewis again notes his chronic pain as a psychosocial stressor during his psychiatry follow up appointment on November 3, 2018.

48. On December 17, 2018, it is indicated on a Back (Thoracolumbar spine) Conditions Disability Benefits Questionnaire that his back condition and pain was now impeding on his ability to work.

49. Lewis could not twist his back, make any extreme bending movements, lift heavy objects, could not stand for prolonged periods or time, and could not partake in prolonged ambulation activities.

50. A follow up appointment for the SI joint block was conducted on December 27, 2018. During this visit Mr. Fonseca explained that the SI Joint block did not provide relief beyond a brief initial respite, and that his pain returned worse than before.

51. Mr. Fonseca requested a handicap permit due to the severity of his symptoms.

52. Acupuncture, topical NSAIDS, transcutaneous electrical nerve stimulation, and heating pads were recommended to Mr. Fonseca as treatment options.

53. Further investigation of his "bone island" was not carried out.

54. Lewis, who continued to suffer from pain without relief, requested another consultation as to his lower back pain on February 2, 2019.

55. Lewis continues with his mental health treatment and multiple references to his chronic pain are noted.

56. On August 20, 2019, an x-ray is taken of Mr. Fonseca's left knee as he had begun to experience pain in the joint. The results were found to be normal.

57. A secondary CT is performed on October 1, 2019, to observe Lewis's liver, gallbladder, pancreas, spleen, adrenal glands, kidneys, bowels, and other organs in the abdomen and pelvis.

58. The study did not investigate the mass on Lewis's left femur.

59. Lewis continued with his treatment plan as advised and continued to note his chronic back pain until November 5, 2019, when he arrives to the VA and again requests a physical medicine and rehabilitation consultation for his unending back pain.

60. Mr. Fonseca describes his pain as extreme. X-ray imaging is ordered.

61. The x-rays of Mr. Fonseca's spine lumbosacral, spine thoracic, and cervical spine are conducted on January 14, 2020. The X-ray images did not reveal major concerns.

62. Again, no images of his hips were ordered or taken to further investigate the cause of his pain.

63. No MRI was taken of these areas which would have revealed the cancer in the femur which was causing him the pain.

64. On January 23, 2020, Lewis's pain medication is changed from Meloxicam to Naproxen as the Meloxicam, originally prescribed in June 2018, was not relieving his pain.

65. Lewis notes his left knee pain has persisted for 6 months.

66. A follow up visit is conducted with Edwin Correa on January 27, 2020. Lewis now rates his back pain as a much greater 9/10 and reports new neck pain, which he rates as a 7/10.

67. Lewis was provided home icing instructions to treat his extreme pain and began receiving electrical muscle stimulation.

68. On April 24, 2020, he again reports his lower back pain as severe, rating it as a 9/10.

69. A CT of Mr. Fonseca's upper abdomen is performed on September 24, 2020.

70. Lewis's hip/femur bone is not observed or remarked upon.

71. An echogram of his abdomen is performed as well.

72. Again, Lewis's hip/femur bone is not observed or remarked upon, nor is the mass investigated.

73. On September 28, 2020, an MRI of Lewis's lumbar spine was taken as his pain had continued to worsen and was now radiating down his left leg.

74. Lewis begins an occupational therapy program in late October 2020 to address his continued back pain as well as other concerns.

75. Lewis again seeks consultation for his back pain on November 17, 2020. He is advised to continue pain medication, core strengthening exercise and stretching at home.

76. During a telehealth follow up visit on February 10, 2021, Lewis reports new radicular pain in his arms and legs, as well as the continued pain in his back.

77. Mr. Fonseca again returns to the VA on February 24, 2021, now reporting tingling and numbness in his arms and legs, as well as occasional weakness in his legs.

78. An MRI of Mr. Fonseca's cervical spine is taken on March 16, 2021.

79. Again, no dedicated images of his hip are ordered or taken.

80. Medical files indicated he complained of his continuing pain in April 2021through August 2021.

81. He noted the chronic pain had impacted him negatively during his mental health evaluations.

82. On April 19, 2021, Lewis raises concerns regarding memory loss, concentration, and attention problems.

83. Lewis requests a consultation regarding his chronic back pain which had since spread to his neck on May 18, 2021.

84. An MRI of his brain is performed to discard potential contributing factors to Lewis's cognitive concerns.

85. It is noted that Lewis's memory, concentration and attention problems are likely due to his emotional state.

86. On June 28, 2021, x-ray images are taken of his elbow, shoulder, and wrist as his pain continues to spread.

87. No significant radiographic bony, joint or soft tissue abnormalities in his elbow, shoulder, and wrist are detected.

88. A July 12, 2021, neuropsychological consultation noted that his low back pain could be a factor impacting his cognitive functioning.

89. Lewis again notes his chronic back pain during a mental health visit on August 10, 2021.

90. On August 16, 2021, Mr. Fonseca undergoes electrodiagnostic (EDX) studies and nerve conduction studies (NCS), which returned normal results.

91. Three years and eight months *after* the mass on Lewis's femur—incorrectly diagnosed as a "bone island"—is identified, further investigation is finally ordered.

92. It was not until February 1, 2022, that an MRI of Mr. Fonseca's pelvis is recommended.

93. Despite the presence of a mass on his left femur accompanied by progression in symptoms and pain, no MRI imaging of his hip was taken during this period of time nor was a biopsy of the mass taken.

94. Lewis's pain continues to spread to his hands.

95. On March 10, 2022, another cervical spine x-ray is taken, again reveling "grossly unremarkable cervical spine series." X-rays of his hands are also captured.

96. At long last, an MRI of his pelvis is conducted on April 13, 2022.

97. The April 13, 2022, MRI images immediately indicate a need for further evaluation and a potential diagnosis of "cystic lesions, myxomatous soft tissue tumors and other soft tissue sarcomas," are noted.

98. In the meantime, Mr. Fonseca continues to see his VA medical team.

99. Almost three months later, a follow up MRI of his pelvis was conducted on July 7, 2022, this time a fine-needle biopsy for final histologic diagnosis is advised.

100.    The mass previously diagnosed as "benign" had grown significantly to a size larger than a golf ball (4.4 x 3.2 x 3 cm) and spread to muscle and bone.

9

101.    A biopsy was performed on August 26, 2022. During this biopsy, bone erosion was noted and Mr. Fonseca was noted to **be at risk of a pathologic fracture** as a result.

102.    The biopsy revealed a left proximal femur lesion and a sarcoma with pleomorphic and focally myxoid features.

103.    Lewis underwent left proximal femur myxofibrosarcoma surgical removal in Miami on November 4, 2022.

104.    Lewis was officially made aware of his cancer diagnosis the following month, when he was notified by his doctor through a phone call on September 21, 2022.

105.    Surgery to remove his bone cancer was performed—a wide resection of the left proximal femur sarcoma and left proximal femoral hemiarthroplasty—and part of his hip bone was replaced.

106.    Lewis was told by his doctor that the cancer had resulted in a 60% loss in bone mass of the area immediately surrounding the tumor.

107.    Approximately 7cm of Mr. Fonseca's upper femur bone had to be removed and replaced with a prosthetic implant.

108.    Risks associated with untreated pleomorphic and focally myxoid sarcoma, what Lewis had for years undiagnosed, include destruction and weakening of the femoral bone.

109.    Had Lewis's left femur been subjected to an MRI back in May of 2018, early treatment could have been commenced, and such extensive loss of bone could have been prevented.

110.    He was discharged on November 18, 2022, to continue his medical care at the San Juan VA medical center.

111. After the left hip replacement, Mr. Fonseca suffered months of painful recuperation and physical therapy.

112. He returned to Miami in December 2022, to undergo thirty-three (33) radiotherapy sessions at the same hospital.

113. Prior to his radiation therapy, Mr. Fonseca also manifested deep concerns to the San Juan VA about his radiation treatment and his ability to father children. Yet, his worries were not taken seriously.

114. The San Juan VA instructed him to provide a sperm deposit to Reprotech of Miami, FL.

115. Reprotech is a third party that provides cryostorage of reproductive tissues. Reprotech received Lewis's deposit on August 24, 2023.

116. The VA was to provide payment to Reprotech for storage and safe keeping of the deposited sperm.

117. To add insult to injury, the San Juan VA has botched Mr. Fonseca's sperm storage, failing to provide payment as required.

118. Lewis has since been contacted by this third party and informed that his sperm would be destroyed/disposed of due to lack of payment.

119. Lewis unaware as to whether his reproductive materials would be destroyed, and thus, his ability to ever father a biological child, was forced to make various calls to Reprotech and the VA in attempts to secure the outstanding payments and ensure that his sperm was not destroyed in the meantime.

120. This uncertainty as to the status of his sperm presented significant worry and anxiety for Lewis.

121.    Despite Reprotech receiving Lewis's deposit in August of 2023, the VA did not reach out to Reprotech to address the still outstanding payment until September 2025.

122.    While Lewis has been informed his sperm is no longer slated for immediate destruction, payment remains outstanding. And thus, the future of his sperm remains indeterminate as well.

123.    Further, Mr. Fonseca's post-surgery recovery treatment was deficient. This is reflected in the VA's medical record, where it is stated that Mr. Fonseca was "upset due to a lack of services in community care." That statement is still true today.

124.    Mr. Fonseca used to be an athletic, physically active man who used to enjoy outdoor activities and going to the gym.

125.    Now, due to VA's negligent testing, misdiagnosing and treatment have affected his musculoskeletal system to the point that he is relegated to ambulating with a cane and can no longer move and exercise as the young man that he still is.

126.    The VA failed Mr. Fonseca, and it is directly responsible for his physical and emotional damages.

127.    The VA misdiagnosed him for years and, therefore, delayed an in-time diagnosis of his cancer and appropriate treatment for Mr. Fonseca.

128.    The VA failed to order further investigation as to the mass on his left femur, leading to an almost four-year delay in appropriate treatment and loss of bone mass.

129.    The VA's negligent actions and omissions resulted in a young man having to unnecessarily suffer great pain for years.

130.    The VA's negligence adversely affected Lewis's overall musculoskeletal system causing much pain and suffering.

12

131.    The VA's negligence directly contributed to the deterioration of Lewis's emotional condition.

132.    The VA's negligence prevented Mr. Fonseca from working for years while he suffered pain and emotional anguish as his cancer continued to progress unimpeded for years.

133.    As a direct result of the VA's negligent actions and omissions he faces the possibility of not being able to procreate children, something he was looking forward to with keenness.

134.    In light of the years of pain, mental anguish, and potential loss of the ability to sire a child, Mr. Fonseca deserves to be compensated for the below-standard care that he received from the VA and requests no less than $3,000,000 in physical and emotional damages.

## FIRST CAUSE OF ACTION

135.    The allegations contained in paragraphs 1 through 134 of this Complaint are incorporated herein by reference as if again fully set forth.

136.    Defendant owed a duty of care to Mr. Fonseca in this case.

137.    Defendant breached its duty of care by failing to provide Mr. Fonseca with adequate and timely medical attention and care.

138.    Defendant breached its duty of care by failing to provide Mr. Fonseca with timely testing and proper evaluation to discard the cause of his painful condition.

139.    VA doctors failed to order adequate tests and clinical work ups, needed to rule out a more serious condition like the cancer that was ultimately diagnosed.

140.     Defendant breached its duty of care when Mr. Fonseca's complaints of increasing pain in the areas of back, hip, and left leg were repeatedly ignored and the mass on his left femur was not investigated.

141.     The treatment offered by the Defendant to Mr. Fonseca, through its medical, nursing, technical personnel and/or the doctors with privileges who used its facilities, was below the medical standard that satisfies the exigencies generally recognized by the medical profession in light of the modern means of communication and teaching, and, as such, directly caused and/or contributed to Lewis's cancer to spreading unimpeded for years, and thus, the injuries as described herein.

142.     Defendant's personnel failed to exercise the care and precautions required under the circumstances in order to timely detect and prevent years of bone destruction, damage to the musculoskeletal system, and the spread of Mr. Fonseca's cancer.

143.     As a direct and proximate cause of the Defendant's delayed treatment Lewis suffered a substantial loss of bone mass in his left femur, permanently damaging his musculoskeletal system.

144.     At all times herein pertinent, Defendant San Juan VA, its directors, officers, and employees were negligent and breached its duty of care by failing to provide the proper medical attention, in failing to provide timely and adequate medical care, and otherwise failing to exercise due care and caution to prevent the damages and death of Mr. Fonseca through the negligent medical treatment he received.

145.     Among other acts or omissions that fell below the applicable standard of care, Defendant should have made timely changes to his medical treatment or ordered further

effective diagnostic tests, once the bone island was identified and Lewis's symptoms failed to respond to treatment.

146.    Defendant should have performed laboratory studies and an MRI to confirm the nature of the bone island, instead it relied on inadequate x-ray images.

147.    Among other acts of omissions that fell below the applicable standard of care, Defendant should have referred Mr. Fonseca for further evaluation once he complained of significant lower back pain that did not respond to treatment.

148.    Further acts of omissions that fell below the applicable standard of care include the mismanagement of, and failure to provide payment for, cryostorage of Mr. Fonseca's reproductive tissues.

149.    As a direct and proximate cause of the Defendant and its personnel, failure to properly treat Mr. Fonseca, Lewis sustained severe physical and emotional pain and suffering and other damages, as described below.

## DAMAGES

150.    The allegations contained in paragraphs 1 through 149 of this Complaint are incorporated herein by reference as if again fully set forth.

151.    Mr. Fonseca lost bone mass in his left femur as the cancerous tumor was allowed to keep growing without any further investigation for almost four years. As a result, he remained in tremendous pain which eventually became excruciating pain.

152.    Mr. Fonseca's major depression disorder had been aggravated as a result of his chronic pain and resulting poor sleep.

153.    Mr. Fonseca was unable to work for extended periods of time due to his years of unmitigated pain as his cancer spread without intervention.

15

154.    As a result of the years of medical malpractice at the VAHSJ, Mr. Fonseca Musculo skeletal system as well as his postural and biomechanical compensation have been damaged and misaligned, and thus still suffers from significant mobility problems including pain.

155.    As a result of the medical malpractice at the VAHSJ, Lewis lost substantial bone mass in his left femur. Consequently, he is incapacitated and needs to use cane to move at all times or risks injury. Walking takes him great effort, and Mr. Fonseca tries to conceal his limp as much as possible.

156.    Mr. Fonseca would be able to ambulate with greater ease had the VA intervened earlier to prevent unnecessary bone loss as a result of his cancer they left untreated for years.

157.    Mr. Fonseca faces difficulties in performing daily housework and chores. Opting to now live in a studio apartment to ease his burden. He is no longer able to assist his grandparents and younger siblings in the way he would before.

158.    Mr. Fonseca used to be an avid runner. Running up to six times a week. He has had to stop running entirely.

159.    He also used to routinely enjoy hikes. He would find joy in finding a new hiking trail to explore two to three times a month. He can no longer enjoy hiking as he did before due to the limitations in his movement.

160.    As a result of the VA's failure to provide payment for cryostorage of Mr. Fonseca's reproductive tissues, the future of his sperm and reproductive ability remains unknown.

161.    Mr. Fonseca has been unable to work due to the continued pain and the physical toll on his body.

16

162.    As a direct result of VA's negligence, Lewis's quality of life has seriously deteriorated and will remain so for the future.

163.    As a direct result of VA's negligence, Lewis has been unable to work and thus encountered financial difficulties.

164.    As a result of the negligence and medical malpractice, the physical and mental damages suffered by Mr. Fonseca are no less than the sum of THREE MILLION DOLLARS ($3,000,000).

**WHEREFORE**, Lewis demands judgment against the United States, in the amount of no less than THREE MILLION DOLLARS ($3,000,000), as well as costs incurred, and reasonable attorney's fees, if warranted by the provisions of the Equal Access to Justice Act, and any further relief which this Honorable Court may deem just and proper.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico this 18th day of March, 2026.

**CERTIFICATE OF SERVICE**: We hereby certify that on this same date, the preceding motion was filed with the Court's CM/ECF system, which will notify the counselors of record.

*Counsel for Plaintiff:*

**INDIANO & WILLIAMS, P.S.C.**
207 del Parque Street; 7th Floor
San Juan, Puerto Rico 00912
Tel.: (787) 641-4545 / Fax (787) 641-4544

jeffrey.williams@indianowilliams.com
vanesa.vicens@indianowilliams.com
joanne.pimentel@indianowilliams.com
lidiana.economou@indianowilliams.com

*s/ Jeffrey M. Williams*
JEFFREY M. WILLIAMS
USDC PR Bar No. 202414

*s/Vanesa Vicéns-Sánchez*
VANESA VICÉNS-SÁNCHEZ
USDC PR Bar No. 217807

*s/Joanne Pimentel*
JOANNE PIMENTEL
USDC PR Bar No. 309005

*s/ Lidiana Teresa Economou*
LIDIANA TERESA ECONOMOU
USDC PR Bar No. 306909